IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| ALLEN G. HUTCHENS, | ) | |
| | ) | |
| Plaintiff, | ) | CV-04-281-ST |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | |
| TERESA HUTCHENS-COLLINS, | ) | |
| | ) | |
| Defendant. | ) | |

STEWART, Magistrate Judge:

## **INTRODUCTION**

On August 18, 2005, plaintiff, Allen G. Hutchens ("Hutchens"), filed a Third Amended Complaint (docket # 100), alleging that defendant, Teresa Hutchens-Collins ("Hutchens-Collins"), had intentionally interfered with his prospective inheritance. As a result, he seeks to recover consequential damages resulting in bodily harm, severe pain and suffering, severe mental anguish and emotional distress, and punitive damages.

1 - OPINION AND ORDER

This court has jurisdiction over this action pursuant to 28 USC § 1332(a)(1) as complete diversity exists between the parties and the amount in controversy exceeds $75,000.[1]

Two previous motions to dismiss were decided by Findings & Recommendations ("F&R"), the first one signed on October 22, 2004 (docket # 73) and adopted on February 4, 2005 (docket # 77), and the second signed on June 28, 2005 (docket # 93) and adopted on July 27, 2005 (docket # 97). The parties have now consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Hutchens-Collins has filed a Motion for Summary Judgment (docket # 170), and Hutchens has filed a Cross Motion for Summary Judgment (docket # 189). For the reasons that follow, Hutchens-Collins' Motion for Summary Judgment is granted, and Hutchens' Cross Motion for Summary Judgment is denied.

## **LEGAL STANDARD**

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely

---

[1] Hutchens seeks recovery of one-third of his mother's estate in the approximate sum of $6,000. However, he also seeks consequential damages in the amount of $250,000 and punitive damages in an amount to be determined by the jury. The amount in controversy may include consequential damages, which brings the total amount in controversy over $75,000.

colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).

## BACKGROUND

Hutchens' claim arises from a family dispute concerning the disposition of the assets of his mother, Juanita M. Wright ("Wright"), who died on March 19, 2003. Wright had four children. Hutchens, who resides in Florida, is her oldest son. Hutchens-Collins is Wright's granddaughter and Hutchens' niece since her father (now deceased) was Hutchens' brother.

On December 14, 1997, Wright gave Hutchens-Collins her Power of Attorney with the understanding that it would not be used without her permission or unless she was declared legally incompetent. Hutchens alleges that in May 2002, shortly after Wright revoked Hutchens-Collins' Power of Attorney, Hutchens-Collins withdrew all of Wright's funds in the amount of $18,266.42[2] from her Washington Mutual Bank accounts. Hutchens claims that under Wright's last will, he is the intended recipient of one-third of Wright's estate, and alleges that Hutchens-Collins deprived him of his inheritance by improperly using her Power of Attorney to disburse Wright's assets prior to her death in a manner inconsistent with Wright's will.

---

[2] Hutchens claims the sum is actually $18,572. However, the sums referenced in the Amended Complaint, Exhibit 2, total $18,266.42, not $18,572.08.

## DISCUSSION

I.   **Hutchens-Collins' Motion For Summary Judgment**

   A.   **Admissible Exhibits**

As a preliminary matter, Hutchens challenges the admissibility of all of the exhibits submitted in support of Hutchens-Collins' Motion for Summary Judgment on the basis that they are unauthenticated.

"It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F2d 1179, 1181 (9th Cir 1988), citing FRCP 56(e).  "[D]ocuments which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." *Id* at 1182, citing *Canada v. Blain's Helicopters, Inc.*, 831 F2d 920, 925 (9th Cir 1987).  "The requirement of authentication or identification" is "a condition precedent to admissibility" and "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FRE 901.  Authentication can be satisfied by evidence of distinctive characteristics such as "[a]ppearance, contents, substance, internal patterns," taken in conjunction with circumstances to be sufficient to support a finding that the document is what the proponent claims. FRE 901(b)(4).  In addition, under FRE 902, some documents are self-authenticating.

   1.   **Website Documents**

Hutchens first objects to various documents submitted by Hutchens-Collins (Purcell Decl. in Support of Motion for Summary Judgment, Exhibit 1, pp. 1-2, 3-5, 7-9, 10-15) which were viewed by her attorney, Michael Purcell ("Purcell"), on the internet website of "www.personalsales.com/DOCUMENTS" while he was conducting a Google search for the

name of Hutchens.  Purcell Decl. in Support of Reply, ¶ 2.  Purcell obtained two CD-ROM disks containing these documents from Sean Barry ("Barry"), a Senior Consultant in the Forensics E-Discovery Group at New Technologies, Inc. ("NTI"), a company specializing in the preservation, identification, extraction and documentation of computer evidence.  Barry Decl., ¶¶ 2, 6.  The CD-ROMs were "write-only," making it impossible to alter or modify their files and resave them to the disks.  *Id* at ¶ 8.  Purcell printed out all the documents from the CD-ROM without altering the electronic data that produced them.  Purcell Decl. in Support of Reply, ¶¶ 5-6.

Barry made the CD-ROMs on December 13, 2005, by downloading all the files associated with "www.personalsales.com/DOCUMENTS," an internet address not protected by any password or other means restricting access to it and freely available to anyone with a computer and access to the internet.  Barry Decl., ¶¶ 6, 9.[3]  According to Barry, internet websites have registered domain names which give the registering party the practical and legal ability to control all material uploaded to the website.  *Id* at ¶ 10.  Through a publicly available service called the WHOIS system, Barry learned that as of December 13, 2005, the registering party for the "www.personalsales.com" domain was Personal Sales Corporation, located at 5271 Images Cir Apt 106, Kissimmee, FL 34746, and the administrative/technical contact was "Hutchens a6551@AOL.COM."  *Id* at ¶ 11.

---

[3] In his Motion for Preliminary Injunction (docket # 223) and Motion to Reconsider Motion for Preliminary Injunction (docket # 228), both denied by this court, Hutchens asserted that these documents were illegally obtained from the website "www.personalsales.com/DOCUMENTS" because Barry accessed password-protected documents and Purcell used these documents for a purpose other than for informational purposes.  Whether or not these documents were lawfully obtained, Hutchens has not denied their existence or authorship and has submitted these same documents into the court record.

Hutchens-Collins has presented no information about Personal Sales Corporation. However, Hutchens has submitted a certified copy of that company's business account signature card dated November 8, 1996, which lists himself, his wife (Bonnie K. Hutchens), and Wright as authorized signatories. Plaintiff's Memo in Support of Cross Motion for Summary Judgment, Exhibit 28. Hutchens appears as the secretary, while Wright is the president and Bonnie is the vice president of the corporation. The address of Personal Sales Corporation coincides with Hutchens' address in a letter addressed to Shoney's restaurant. Purcell Decl. in Support of Motion for Summary Judgment, Exhibit 1, p. 15. Moreover, as explained above, the internet search found a link between the names of Hutchens and Personal Sales Corporation. Considering the totality of the circumstances, the court finds that Hutchens-Collins has submitted sufficient evidence to satisfy the authentication requirement for these documents under FRE 901(b)(4).

Hutchens further maintains that Purcell violated FRCP 34 by having plaintiff's electronic records copied without a subpoena issued by the court and served upon the alleged custodian of the records, E-Z Hosting Company, without his knowledge and consent. Information freely accessible from the internet is not subject to the requirements of FRCP 34. Moreover, the custodian of the records is the domain's registering party, Personal Sales Corporation, rather than E-Z Hosting Company. Barry Decl., ¶¶ 10-11.

### 2. Letter to Shoney's Restaurant

Hutchens also objects to the authenticity of a letter he wrote to Shoney's restaurant. Purcell Decl. in Support of Motion for Summary Judgment, Exhibit 1, pp. 10-15. However, this letter appeared on the Personal Sales website and is authenticated for the same reasons as the

other website documents. In addition, Purcell obtained this document from Hutchens via facsimile during discovery. *Id* at ¶ 9. The fax number (407-397-9439) and the name (Allen G. Hutchens) appear in the document's header. *Id* at Exhibit 1, pp. 10-15. Hutchens has admitted in other filings with the court that this facsimile number belongs to him. *E.g.,* docket # 202 (footer). Accordingly, the letter is sufficiently authenticated under FRE 901(b)(4). However, it has not been relied upon by the court to resolve the pending motions.

### 3. Wright's Washington Mutual Certificate of Deposit

Next, Hutchens asserts that a document purporting to be Wright's Washington Mutual Certificate of Deposit lacks authentication. Purcell Decl. in Support of Motion for Summary Judgment, Exhibit 1, p. 6. The document contains the date of the account (March 18, 2002), the account number (238-1053063-0), the customer names on the account (Wright and Susan Hutchens-Carr), the initial principal amount, interest rate and the date of maturity (March 18, 2005). *Id*.

Purcell obtained this document from Hutchens in the course of discovery, an allegation Hutchens has not denied. Purcell Decl. in Support of Motion for Summary Judgment, ¶ 6. Hutchens has failed to explain where he obtained the document. Not only does the account number appearing on the document also appear in Exhibit 2 attached to the Third Amended Complaint, but the opening date of the certificate also coincides with the date the seven certificates of deposit referenced by Hutchens matured. Plaintiff's Memorandum in Support of Cross Motion for Summary Judgment, Exhibit 5. Thus, based on the totality of the evidence, this document satisfies the requirement of authentication under FRE 901(b)(4).

### 4. Wright's Medical Record from Farmington Square

7 - OPINION AND ORDER

Hutchens also objects to the authenticity of an unsigned document purporting to be doctor's notes from Wright's medical visit on June 18, 2002. Purcell Decl. in Support of Motion for Summary Judgment, Exhibit 1, p. 16. The document contains the name of the patient (Wright) and the name of the doctor (Jon M. Hobson, MD).

In his affidavit, Purcell declares that this document was obtained by subpoena from Farmington Square, an assisted living facility in Gresham, Oregon. *Id* at ¶ 7. However, he has offered no proof of custody under FRE 901, and the record is not self-authenticating under FRE 902. Even if authenticated, the document represents inadmissible hearsay. It is an out-of-court statement offered to prove the truth of the matter asserted (FRE 801-02) and fails to satisfy the business record exception (FRE 803(6)). Therefore, this document is stricken.

### B. Intentional Interference with Prospective Inheritance

#### 1. Legal Standard

As discussed in this court's previous rulings, under Oregon law, a claim for intentional interference with a perspective inheritance does not exist as a tort of its own, but instead is an extension of the tort for intentional interference with economic relations. *Allen v. Hall*, 328 Or 276, 284-85, 974 P2d 199, 204 (1999). To prevail on this claim, a plaintiff must establish each of the following elements:

> (1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.

*McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841, 844 (1995).

8 - OPINION AND ORDER

"[T]here can be recovery only for an inheritance or gift that the other would have received *but for* the tortious interference of the actor." *Allen*, 328 Or at 287 n3, 974 P2d at 204 n3, citing RESTATEMENT (SECOND) OF TORTS, § 774B, comment d (emphasis added). The element of damages refers to "damage to the economic relationship," *i.e.* whether the defendant's tortious interference caused the plaintiff economic damages.

### 2. Economic Damages

In his Third Amended Complaint, Hutchens contends that as a result of Hutchens-Collins wrongfully withdrawing $18,266.42 from Wright's bank accounts, he has been deprived of his inheritance, which would have been one-third of that amount, or approximately $6,088.81. Hutchens-Collins moves for summary judgment on the ground that Hutchens has failed to create a genuine issue of material fact as to whether he suffered any actual damage because of her alleged interference with his inheritance. She maintains that even if she had not wrongfully withdrawn funds from Wright's bank accounts, Hutchens would have inherited nothing and suffered no economic damages.

Hutchens disagrees, identifying funds earmarked for litigation by his mother which would otherwise have been part of the estate. He alleges that these funds would have made the estate solvent, giving him a prospective inheritance. However, even when viewing the facts most favorably to Hutchens, he has failed to prove that he has suffered any economic damages.

### a. Assets of Estate According to Hutchens-Collins

Hutchens-Collins offers various documents purporting to establish that Wright's estate was insolvent. She admits that in May 2002, she withdrew $18,266.42 from bank accounts belonging to Wright. One of these bank accounts contained an initial principal amount of

$6,319.29 as of March 18, 2002.  This account was in Wright's name in trust for Susan Hutchens-Carr, who is Hutchens' daughter and Wright's adopted daughter.  Purcell Decl., Exhibit 1, p. 6.  A reasonable expectation existed that Susan Hutchen-Carr would outlive Wright, as in fact she did, thus inheriting the money in this account and eliminating it from Wright's estate.  As a result, in May 2002, the assets of the estate totaled $11,947.13 ($18,266.42 less $6,319.29).

After Wright passed away, Hutchens sent a letter dated April 4, 2003, to the creditors of his mother's estate, claiming that the assets of the estate totaled $54.97.  *Id* at Exhibit 1, p. 1.[4]  Accepting this representation as true and absent any contrary evidence, if Hutchens-Collins not earlier withdrawn funds from Wright's bank accounts, then the total assets of the estate as of April 2003 presumably would have been $54.97 plus the $11,947.13 taken earlier by Hutchens-Collins, for a total of $12,002.10.

In his April 4, 2003 letter to creditors, Hutchens also represented that Wright's estate had $7,983.15 of debt.  *Id.*  Hutchens-Collins correctly asserts that this letter omitted an additional claim against Wright's estate, namely a claim by the State of Oregon Department of Human Services for recovery of public assistance funds in the amount of $12,245.83.  *Id* at ¶ 2, Exhibit 1, pp. 3-5.  Hutchens does not dispute the existence of this debt.  Thus, as of April 2003, the estate's total debts were $20,228.98 ($7,983.15 plus $12,245.83).

The parties agree that a provision in Wright's last will requires the payment of all the debts Wright was legally obligated to pay at the time of her death *before* the distribution of the

---

[4] Although Hutchens claimed to be the personal representative of his mother's estate, he was never appointed.

10 - OPINION AND ORDER

remainder of the estate to her three living children. Third Amended Complaint, Exhibit 9. After paying off $20,228.98 in debts, Wright's estate would have been insolvent by $8,226.88. Since one-third of nothing is nothing, Hutchens would have received no inheritance and thus suffered no damages even if Hutchens-Collins had interfered with his inheritance.

### b. Facts According to Hutchens

However, in addition to the assets of Wright's estate identified above, Hutchens identifies the following additional funds of $41,000, which allegedly would have been part of the estate *but for* the Hutchens-Collins' interference: (1) $20,000 in insurance proceeds from Wright's April 29, 2002 auto accident; (2) $3,500 from the pension of Fred Otterson ("Otterson"), Wright's deceased husband; (3) $12,500 from Otterson's life insurance; and (4) a $5,000 check from Wright's Key Bank account. Hutchens claims that Wright assigned him these funds to him after May 2002 "for the purpose of litigation" against Hutchens-Collins to recover Wright's assets and that he deposited the funds in the checking account of the Personal Sales Corporation to which Wright had access as a signatory on the account.[5]

In support of his contention that additional funds would have been part of Wright's estate but for Hutchens-Collins' interference, Hutchens offers the following evidence: (1) a Compensation Agreement with Wright, dated May 15, 2002, signed only by him both on his behalf and on Wright's behalf as attorney-in-fact, setting his wage at $10 per hour plus expenses for his Power of Attorney services (Plaintiff's Response Memo, Exhibit 2);[6] (2) assignment of

---

[5] Whether Wright actually owned any portion of those funds in unclear since the record does not reveal who owned the shares of Personal Sales Corporation.

[6] Hutchens-Collins challenges the validity of this Compensation Agreement on the basis that its file properties (metadata) indicate that it was first created and last saved on August 26, 2003. *See* Reply Exhibits, p. 7, Purcell Reply Decl., ¶ 6,
(continued...)

11 - OPINION AND ORDER

Otterson's pension "lump payment" to Hutchens, signed by Wright on August 5, 2002 (*id* at Exhibit 2);[7] (3) assignment of damages from Wright's April 29, 2002 auto accident to Hutchens, signed by Wright on August 5, 2002 (*id* at Exhibit 3);[8] and (4) a November 8, 1996 signature card for the SunTrust Bank business checking account belonging to the Personal Sales Corporation, with Hutchens, his wife, and Wright listed as the three signatories (*id* at Exhibit 4). Although Hutchens claims that Wright also assigned to him $12,500 from Otterson's life insurance and a $5,000 check from a Key Bank account, he has not submitted any supporting evidence of those assignments.

Even accepting Hutchens' position that Wright assigned him assets worth an additional $41,000 to litigate against Hutchens-Collins, the estate's total assets would equal $53,002.10 ($12,002.10 from the sources identified above plus the $41,000 assigned to him for litigation). Subtracting the estate's debts of $20,228.98 would result in a solvent estate of $32,773.12 and a one-third prospective inheritance of $10,924.37 for Hutchens.

---

[6](...continued)
Barry Decl., ¶¶ 14-16. It is also unclear from the record why Hutchens charged a rate of $5.15 per hour between May and August 2002, before increasing his rate to $10 per hour between September 2002 and August 2003. *See* Plaintiff's Response Memo, Exhibit 2. The court need not resolve these issues since it would reach the same result without considering the Compensation Agreement.

[7] No evidence has been produced as to the extent of Otterson's pension and Hutchens makes inconsistent allegations regarding its amount: $3,500 (Plaintiff's Memorandum, p. 7); $3,000 (Plaintiff's Motion, unnumbered last page); and $1,212.97 plus $366.81 (Plaintiff's letter to Susan Hutchens-Carr, *see* Defendant's Reply Exhibits, p. 18).

[8] Hutchens-Collins has submitted evidence that Hutchens knew as of April 8, 2003, that his mother's death on March 19, 2003 terminated his Power of Attorney (Reply Exhibit, pp. 10-11), and yet he continued to negotiate with the insurance company as late as April 22, 2003, when he drafted a release for the claim arising out of his mother's car accident (*id* at 8-9). Hutchens-Collins believes that without being appointed personal representative by a court, Hutchens could not lawfully receive these funds. Questions are also raised by Hutchens' February 5, 2003 letter informing a law firm of his decision "to withdraw from pursuing any funds" from the settlement of the auto accident (*id* at 12), followed by the letter to the insurance company releasing the claim in consideration for $20,000 (*id* at 8-9). The court need not resolve these issues and apparent inconsistencies since, even under the facts most favorable to Hutchens, the court would reach the same result.

Hutchens also contends that but for his niece's interference, the estate's total debts would be less than $20,228.98 because he is a skilled negotiator who could have convinced the creditors to reduce the estate's debts. However, without being appointed Wright's personal representative by a court, Hutchens could not lawfully negotiate on behalf of Wright's estate. Even if he had the authority to negotiate on behalf of the estate, his claim as to success as a negotiator is speculative at best. And even if the estate's debts were reduced based on such speculation, it would make no difference to the outcome in this case.

The critical point is that Hutchens received more money from his mother *in wages* to litigate against Hutchen-Collins than he would have received *for his share of the inheritance* had Hutchens-Collins not taken the funds from Wright's bank accounts. According to Hutchens, between May 2002 and August 2003 he billed his mother $29,842.00 *in wages*[9] for his service performed under his power of attorney. This sum consists of a payment of $22,372, a bonus of $4,500 in the form of a "demand note," and another $2,970 that had not been paid as of August 2003. *Id* at Exhibit 1.[10] The record contains no accounting of the services he performed to bill his mother $29,842 in wages, but this court will accept Hutchens' representation that he did indeed earn those wages. In his Cross-Motion for Summary Judgment, p.15, Hutchens alleges that as of February 1, 2002 [*sic*], all funds for wages had been depleted and five months of his wages remained unpaid. If these amounts were still unpaid at the time of Wright's death, then

---

[9] Hutchens identified these sums as "amount of *wages* to Allen G. Hutchens paid as follows." Plaintiff's Response Memo, Exhibit 1 (emphasis added). No part of this amount was identified as other litigation expenses.

[10] Hutchens did not file this lawsuit against Hutchens-Collins until February 26, 2004. Therefore, it is unclear what work he actually performed between May 2002 and August 2003, when he often billed his mother at least 8 hours of wages a day, 30 days a month. *See* Plaintiff's Memo, Exhibit 1. However, for purposes of these motions, whether the $29,842 in wages was properly billed need not be addressed.

Hutchens should have listed himself as a creditor in the letter to Wright's creditors, which he did not do. But assuming that the $4,500 demand note and the remaining balance of $2,970 were due and never paid, Hutchens still earned $22,372 in wages from his mother because of Hutchens-Collins' alleged interference with his inheritance.[11] This amount is considerably higher than $10,924.37 he would have inherited if Hutchens-Collins had not intervened. Since Hutchens receives social security benefits, he cannot claim that he could have obtained alternative employment during this time period but for the conduct of his niece. Thus, he is in a better economic position than he would have been but for his niece's alleged interference.

In sum, what Hutchens received in wages from his mother to pursue Hutchens-Collins is far more than the amount of his one-third prospective inheritance from his mother's estate under the facts viewed in the light most favorable to Hutchens for purposes of this summary judgment motion. Resolving inconsistencies in Hutchens' submissions and requiring certain supporting documentation missing from his submissions would not change the outcome. Accordingly, Hutchens has failed to show a genuine issue of material fact that he has suffered economic damages as a result of Hutchens-Collins' alleged interference with his inheritance.

### 3.  Non-Economic and Punitive Damages

It is not clear from the Third Amended Complaint whether Hutchens alleges that he has suffered non-economic damages (such as mental anguish and a bleeding ulcer) *directly* as a

---

[11] It is also unclear what happened to the remaining balance of $18,628 in the Personal Sales Corporation's account ($41,000 starting balance minus $22,372 paid in wages). Hutchens contends that he has spent over $17,500 for litigation costs, and that $3,200 came from a line of credit his wife took out for litigation costs. Plaintiff's Cross-Motion for Summary Judgment, p. 12. He also claims that all his litigation efforts since that date have been without the payment of wages.

result of the conduct of Hutchens-Collins with respect to his mother *or indirectly* as a consequence of not receiving his prospective inheritance.

The former would merely be a reiteration of Hutchens' intentional infliction of emotional distress ("IIED") claim, which was dismissed by this court in its F&R signed on June 28, 2005 (docket # 93). As explained in that F&R, Hutchens "was an outsider to any special relationship that may have existed between defendant and Wright. Defendant had no heightened duty to plaintiff sufficient to support an IIED claim merely because of her relationship with Wright." *Id* at 7.

The latter, based on the loss of an inheritance as a result of Hutchens-Collins' interference, would be a claim for consequential damages, *i.e.*, a claim that Hutchens suffered economic damages which then led to his non-economic damages. As discussed above, Hutchens has failed to show a genuine issue of material fact as to whether he has suffered economic damages as a result of Hutchens-Collins' interference. Because his intentional interference with a prospective inheritance claim has failed, any consequential damages he alleges to have suffered as a result of not receiving the prospective inheritance are not recoverable.

Nor can Hutchens recover punitive damages. It is a well-settled principle that a jury may award no punitive damages in tort cases where the plaintiff has not recovered actual damages. *See Howmar Materials, Inc. v. Peterson*, 174 Or App 55, 58 n2, 23 P3d 409, 410 n2 (Or App 2001) (citation omitted).

### 4. Conclusion

Because Hutchens cannot prove that he suffered any damages as a result of Hutchins-Collins wrongfully withdrawing funds from Wright's bank accounts, Hutchins-Collins is granted summary judgment against the intentional interference with a prospective inheritance claim.

///

## II.   Hutchens' Cross-Motion for Summary Judgment

In his Cross-Motion for Summary Judgment, Hutchens alleges that Hutchens-Collins used her restricted Power of Attorney to obtain thousands of dollars for her children, her brother's children, the children of Wright's other son (Bob Montgomery), and other great-grandchildren, and that she structured a manipulative promissory note for the specific purpose of keeping the money from him and his progeny, contrary to the terms and conditions of her Power of Attorney and contrary to Wright's December 14, 1997 will and July 5, 2002 will.[12]

Regardless of whether these allegations are true and without addressing Teresa Hutchens-Collins' evidentiary objections, Hutchens still fails to create a genuine issue of material fact as to whether he suffered economic damages as a result of Hutchens-Collins' alleged interference. Therefore, Hutchens' cross motion must be denied.

## ORDER

For the reasons set forth above, defendant Teresa Hutchens-Collins' Motion for Summary Judgment (docket # 170) is GRANTED, and plaintiff Allen Hutchens' Cross Motion for Summary Judgment (docket # 189) is DENIED.

DATED this 30th day of November, 2006.

---

[12] Hutchens also accuses Purcell of forging Wright's will or lying about it, and alleges that his niece assaulted him during deposition and filed a false police report against him pertaining to this case. These allegations are outside the realm of the Third Amended Complaint and will not be considered here.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

17 - OPINION AND ORDER